ams

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 05-40032-02-JAR |
| | ) | |
| RUDY SANCHEZ-VELA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM ORDER AND OPINION DENYING DEFENDANT'S MOTION TO SUPPRESS

This matter comes before the Court on defendant Rudy Sanchez-Vela's Motion to Suppress. (Doc. 53.) Defendant moves to suppress evidence seized after a traffic stop and search of the vehicle he was driving. After reviewing the parties' filings and the evidence adduced at the November 7, 2005 suppression hearing, the Court is now prepared to rule. For the reasons stated below, defendant's motion to suppress is denied.

## I. Factual Background

On March 8, 2005, Trooper Clint Epperly, a drug interdiction trooper, was patrolling near the toll plaza in Emporia, Kansas where Interstate 35 and U.S. Highway 50 split. Traffic on Highway 50 has the right-of-way to merging traffic from the toll plaza, as there is a yield sign posted at the entrance to Highway 50. Trooper Epperly observed a Pontiac Grand-Am bearing a New Mexico license plate merge onto Highway 50 East from a one lane on-ramp without using a turn signal. Trooper Epperly stopped the vehicle at approximately 7:58 a.m. at the Emporia Auto Outlet on Highway 50 for failing to

signal while merging onto Highway 50.  Trooper Epperly approached the passenger side of the vehicle

and spoke to the driver through the window.  The driver provided him with an Ohio identification card

identifying himself as Rudy Vela.  The passenger identified herself to Trooper Epperly as Jennifer

Hernandez and provided him with her date of birth and social security number.  Hernandez did not

provide Trooper Epperly with a driver's license.

After collecting documentation from Sanchez-Vela and Hernandez, Trooper Epperly asked

Sanchez-Vela to sit in his patrol car while Hernandez stayed in the Grand-Am.  Trooper Epperly then

separately asked the two about their travel plans.  Both Hernandez and Sanchez-Vela told Trooper

Epperly that they were on their way to visit Hernandez's aunt in Kansas City.  Hernandez further

detailed that after the visit, she planned to return to New Mexico and that Sanchez-Vela planned to

return to Ohio.  Trooper Epperly called dispatch to check the status of both drivers' licenses and

discovered that Sanchez-Vela's license was suspended.  Trooper Epperly told Sanchez-Vela that his

license was suspended and that he would be unable to drive the vehicle.

Trooper Epperly the returned Sanchez-Vela's documents, gave him a warning, and told him he

was free to go.  As Sanchez-Vela opened the door to the patrol car to exit, Trooper Epperly asked him

if he could ask him a few more questions.  Sanchez-Vela replied "yes," and Trooper Epperly asked him

if he understood that he was free to go.  Sanchez-Vela replied, "yes."  Trooper Epperly asked

Sanchez-Vela if there were any drugs in the vehicle and Sanchez-Vela replied, "no."  Trooper Epperly

then asked him if he could search the vehicle for drugs.  Sanchez-Vela told Trooper Epperly that the

Grand-Am was not his vehicle, but that he did not have a problem with him searching.  Trooper

Epperly then asked Hernandez if she would mind if he searched the vehicle for drugs and she replied,

"no."

Trooper Epperly asked both Sanchez-Vela and Hernandez to exit the vehicle and patted down Sanchez-Vela. Trooper Epperly searched the trunk of the vehicle, where he found a duffel bag which he believed contained a large "brick" of illegal contraband. Trooper Epperly placed both Sanchez-Vela and Hernandez under arrest after informing them both of their *Miranda* rights.

## II.  Discussion

### A.  Standing

The Government argued at the suppression hearing that defendant, who did not own the vehicle that was stopped and searched, does not have standing to seek to suppress the items seized from the vehicle. The Tenth Circuit has held that although a defendant may lack the necessary possessory or ownership interest in a vehicle to directly contest the search of that vehicle, a defendant may contest the legality of his own detention and seek to suppress evidence found in the vehicle as fruit of that illegal detention.[1] In order to successfully suppress evidence based on defendant's unlawful detention, he must "first establish that the detention did violate his Fourth Amendment rights. . . . [and demonstrate] 'a factual nexus between the illegality and the challenged evidence.'"[2] If the defendant is able to make both of these showings, then the government must prove that the evidence sought to be suppressed is not "fruit of the poisonous tree."[3]

---

[1] *United States v. DeLuca*, 269 F.3d 1128, 1132 (10th Cir. 2001); *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000), *cert. denied*, 531 U.S. 887 (2000).

[2] *Nava-Ramirez*, 210 F.3d at 1131 (quoting *United States v. Kandik*, 633 F.2d 1334, 1335 (9th Cir. 1980)).

[3] *Id.*; *DeLuca*, 269 F.3d at 1132.

As described more fully below, Sanchez-Vela is unable to establish that his detention violated his Fourth Amendment rights.  Additionally, Sanchez-Vela may not be able to establish the requisite factual nexus between his detainment and the seized evidence because he did not request to leave the scene of the stop; and he cannot show he would have been able to do so had he asked.  In fact, when he issued Sanchez-Vela the warning, Trooper Epperly told Sanchez-Vela that he could not drive the vehicle because his license was suspended.  Even if Sanchez-Vela had left, the vehicle still would have been searched and drugs would have been found because Hernandez consented to the search.

### B.  Validity of the Initial Stop

"'A traffic stop is a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.'"[4]  The principles of *Terry v. Ohio*[5] apply to such traffic stops.  Thus, the reasonableness of a stop depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[6]  Tenth Circuit cases establish that "a detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping [an] automobile."[7]  Reasonable suspicion may be supported by an "objectively

---

[4]*United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc) (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (further quotation omitted)).

[5]392 U.S. 1 (1968).

[6]*Id*. at 19–20.

[7]*United States v. Cervine*, 347 F.3d 865, 869 (10th Cir. 2003); *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993).

reasonable" good faith belief even if premised on factual error.[8]

Epperly testified that he stopped defendant for merging onto Highway 50 without using his turn signal.  K.S.A. 8-1548 governs turning movements in Kansas and provides:

> (a) No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety, nor without giving an appropriate signal in the manner hereinafter provided.
>
> (b) A signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning.[9]

"Roadway" is further defined by Kansas statute as "that portion of a highway improved, designed, or ordinarily used for vehicular travel, exclusive of the berm or shoulder."[10]  Defendant argues that he was not required to use his turn signal when merging onto the highway pursuant to K.S.A. 8-1548, such that Epperly lacked reasonable suspicion to stop him.  Defendant avers that because he was not turning or changing lanes as he entered the interstate, no traffic violation occurred.  Furthermore, defendant argues that the applicable Kansas statute is  K.S.A. 8-1528(c), which governs yield signs.  That sections states:

> (c) The driver of a vehicle approaching a yield sign shall in obedience to such sign slow down to a speed reasonable for the existing conditions and, if required for safety to stop, shall stop at a clearly marked stop line, but if none, before entering the crosswalk on the near side of the intersection, or, if none, then at the point nearest the intersecting

---

[8]*United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

[9]K.S.A. 8-1548.

[10]K.S.A. 8-1459.

> roadway where the driver has a view of approaching traffic on the
> intersecting roadway before entering it. After slowing or stopping, the
> driver shall yield the right-of-way to any vehicle in the intersection or
> approaching on another roadway so closely as to constitute an
> immediate hazard during the time such driver is moving across or within
> the intersection or junction of roadways.  Such driver shall yield the
> right-of-way to pedestrians within an adjacent crosswalk.  If a driver is
> involved in a collision with a vehicle in the intersection or junction of
> roadways or with a pedestrian in an adjacent crosswalk, after driving
> past a yield sign without stopping, such collision shall be deemed prima
> facie evidence of the driver's failure to yield the right-of-way.[11]

Sanchez-Vela maintains that this statute does not require a turn signal be used when yielding to

oncoming traffic and suggests that he was only required to follow this statute.  Sanchez-Vela further

suggests that K.S.A. 8-1548 is inapplicable when a yield sign is present.

The Court finds that a motorist's failure to signal when moving from the on-ramp onto an

interstate or highway raises at least a reasonable suspicion that a violation of K.S.A. 8-1548 occurred.

As this Court has previously held, the plain language of K.S.A. 8-1548 governs not only turning and

changing lanes as defendant avers, but also moving left or right upon a roadway.[12]  When Sanchez-Vela

merged onto the highway, he moved right upon a roadway from the on-ramp onto the highway.

Moreover, the on-ramp is clearly part of the "roadway" contemplated by Kansas statutes as it is a

"portion of a highway . . . ordinarily used for vehicular travel."  Further, Sanchez-Vela offers no reason

why K.S.A. 8-1528 and K.S.A. 8-1548 could not both  govern merging onto a roadway where a yield

sign is present.  There is nothing in those statutes that suggests they are mutually exclusive.  K.S.A. 8-

---

[11]K.S.A. 8-1528(c).

[12]*United States v. Ortega*, 379 F. Supp. 2d 1178, 1183 (D. Kan. 2005); *see also United States v. Gregoire*, 425 F.3d 872, 877–78 (10th Cir. 2005) (construing a similar Utah statute).

1528 deals with right-of-way, so it is "not surprising that signaling is not mentioned."[13]  A driver may be required to signal when merging onto a roadway, as well as slow down or stop to yield to oncoming traffic.  Here, the Court finds that Sanchez-Vela's act of merging onto Highway 50 East required a move to the right for which a signal was required.

Moreover, the purpose of K.S.A. 8-1548 applies equally to a merging vehicle as it does to a vehicle changing lanes on the roadway.  The use of a signal before changing lanes alerts other motorists to a vehicle's movements.[14]  Indeed, in *State v. DeMarco*, the Kansas Supreme Court explained that the driver of a vehicle parked on the shoulder is entitled to a lane change signal to safely time reentry onto the roadway.[15]  Similarly, the drivers on Highway 50 were entitled to a lane change signal to alert them that Sanchez-Vela was merging onto the roadway.[16]  For all these reasons, the Court concludes that Trooper Epperly had reasonable suspicion to stop Sanchez-Vela for violating K.S.A. 8-1548; therefore, the stop was justified at its inception.

### C.  Detention

Even if the initial stop of defendant's vehicle was legitimate, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place," as required

---

[13]*Gregoire*, 425 F.3d at 877.

[14]*Gregoire*, 425 F.3d at 878 ("the signal lights make the merging vehicle more visible to upcoming traffic and clearly express the driver's intentions."); *United States v. Callarman*, Case No. 00-40056, 2000 WL 1466695, at *5 (D. Kan. Sept. 13, 2000) (noting that the "purpose of turn signals [is] to warn other motorists of one's intent to turn or deviate"), *aff'd*, 273 F.3d 1284 (2001), *cert. denied*, 535 U.S. 1072 (2002).

[15]*State v. DeMarco*, 952 P.2d 1276, 1281 (Kan. 1998).

[16]*Callarman*, 2000 WL 1466695, at *5 (noting that the warning of one's intent to run or deviate "is most needed and appreciated by motorists already within a public roadway keeping a vigilant look out for motorists attempting to enter the flow of traffic").

under *Terry*.[17]  "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop."[18]  An officer may lengthen the detention for questioning or investigation unrelated to the reason for the initial stop: (1) where the detention has become consensual; or (2) if not consensual, where the officer has "'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring' in order to justify detaining an individual for a period of time longer than that necessary to review a driver's license and vehicle registration, run a computer check, determine that the driver is authorized to operate the vehicle, and issue the detainee a citation."[19]  Officers may also inquire about a driver's travel plans without improperly expanding the length of detention.[20]

Here, Trooper Epperly did not detain Sanchez-Vela longer than what was necessary to review and check his driver's license and other documentation, inquire about travel plans, and issue defendant a warning.  Sanchez-Vela objects to Trooper Epperly's further questioning him after issuing the warning and maintains that he was not justified in asking for consent to search the vehicle.  Retention of a motorist's driver's license and/or other pertinent documents by the officer during any questioning renders an encounter not consensual, until such time as the documents are returned.[21]  The Tenth

---

[17]*United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001), *cert. denied*, 535 U.S. 1019 (2002); *United States v. Bustillos-Munoz*, 235 F.3d 505, 512 (10th Cir. 2000), *cert. denied*, 534 U.S. 854 (2001).

[18]*United States v . Cervine*, 347 F.3d 865, 870–71 (internal quotation omitted); *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999).

[19] *United States  v. Salzano*, 158 F.3d 1107, 1111 (10th Cir. 1998) (quoting *United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994)); *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998).

[20]*Cervine*, 347 F.3d at 871.

[21] *See Hunnicut*, 135 F.3d at 1349; *United States v. Walker*, 933 F.2d 812, 817 (10th Cir. 1991), *cert. denied*, 502 U.S. 1093 (1992).

Circuit has consistently held "that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him."[22]  In determining whether a driver and police officer are engaged in a consensual encounter in the context of a traffic stop, there are few, if any, bright-line rules."[23]  Rather, the Court must consider "the totality of the circumstances in a particular case."[24]  While the return of documents, such as a driver's license or other personal papers, is a prerequisite to an encounter becoming consensual, we have acknowledged it "is not always sufficient to demonstrate that an encounter becomes consensual."[25]  Accordingly, even after the officer returns a driver's papers, the encounter may not be consensual where "there was evidence of a 'coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled.'"[26]  The ultimate test is whether "a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information."[27]  Failing to inform a driver that he is free to leave is insufficient to establish that the questioning was not consensual.[28]

Sanchez-Vela maintains that after receiving the warning, he was not truly free to leave because

---

[22]*United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994), *cert. denied,* 511 U.S. 1095(1994); *accord United States v. Lambert*, 46 F.3d 1064, 1068 (10th Cir. 1995).

[23]*United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997).

[24]*Id.* at 814 (citing *Ohio v. Robinette*, 519 U.S. 33, 39 (1996)).

[25]*Id.*; *see also United States v. Gregory*, 79 F.3d 973, 979 (10th Cir. 1996).

[26]*Elliott*, 107 F.3d at 814.

[27]*United States v. McKneely*, 6 F.3d 1447, 1451 (10th Cir. 1993).

[28]*United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000); *Elliott*, 107 F.3d at 814.

9

Trooper Epperly continued to question him before allowing him the opportunity to exit the patrol car. The Court finds no evidence of the traditional factors that would have led a reasonable person to believe they were not free to leave. Trooper Epperly was the only officer present and he clarified with Sanchez-Vela that he understood he was free to leave. There is no evidence of Trooper Epperly touching Sanchez-Vela, or making reference to his weapon. Also, Sanchez-Vela was in the passenger seat of the patrol car and Trooper Epperly was sitting in the driver's seat—there was nothing impeding his path back to the vehicle. The Court finds that under the totality of the circumstances, a reasonable person would have felt free to leave after Trooper Epperly issued the warning citation. Because the encounter subsequent to the warning was consensual, it was lawful under *Terry v. Ohio*.

### D.  Scope of Consent

Assuming Sanchez-Vela has standing to contest the consent provided to Trooper Epperly, the Court finds no evidence present to suggest that either Sanchez-Vela or Hernandez limited the scope of consent to search the vehicle. "The scope of a search 'is generally defined by its expressed object,' and is 'limited by the breadth of the consent given.'"[29] The standard for measuring the scope of consent is "'objective reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect.'"[30] The Court finds that it would have been clear to a reasonable person that the object of the search at issue was illegal drugs, since Trooper Epperly specifically asked for permission to search for drugs. Furthermore, the Court concludes that both

---

[29] *Elliott*, 107 F.3d at 814–15 (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991); *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996) (further internal quotations omitted)).

[30] *Id.* at 815 (quoting *Jimeno*, 500 U.S. at 251).

10

Sanchez-Vela and Hernandez provided consent that  included consent to search the trunk of the vehicle and any containers found therein.  Since "[o]ne in possession of illegal narcotics does not typically leave them out in the open [, c]onsent to an officer's request to search for drugs would reasonably include areas in which one would be expected to hide drugs."[31]

There is likewise no evidence that either Sanchez-Vela or Hernandez attempted to object or limit the scope of consent when Trooper Epperly popped the trunk open.  Therefore, the Court finds there was knowing and voluntary consent to search the entire vehicle, including the trunk and its containers.[32]  As the Supreme Court has stated: "We think that it was objectively reasonable for the police to conclude that the general consent to search respondent's car included consent to search containers within that car which might bear drugs."[33]

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Rudy Sanchez-Vela's Motion to Suppress (Doc. 53) is **DENIED**.

IT IS SO ORDERED.

Dated this  _16th_  day of November 2005.

   **S/ Julie A. Robinson**
**Julie A. Robinson**
**United States District Judge**

---

[31]*United States v. Pena*, 143 F.3d 1363, 1368 (10th Cir. 1998).

[32]*United States v. Bustillos-Munoz*, 235 F.3d 505, 515 n.5 (10th Cir. 2000).

[33]*Jimeno*, 500 U.S. at 251.